**LAW OFFICES OF THOMAS D. MAURIELLO**
Thomas D. Mauriello (SBN 144811)
209 Avenida Fabricante, Suite 125
San Clemente, CA 92672
Telephone: (949) 542-3555
Facsimile: (949) 606-9690
Email: tomm@maurlaw.com

**Attorneys for Plaintiff and Relator**

[Additional counsel on signature page]



## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel.          , | )<br>)<br>) |
| | ) |
| **Plaintiff,** | ) Case No. C-04-04614 SI |
| | ) |
| v. | ) **AMENDED COMPLAINT** |
| | ) *[REDACTED PER ORDER OF* |
| GILEAD SCIENCES, INC., | ) *COURT DATED MARCH 17, 2009]* |
| | ) |
| **Defendant.** | ) |
| | ) |

## AMENDED COMPLAINT

Plaintiff,            , on behalf of the United States of America, for    Amended

Complaint against Gilead Sciences, Inc. ("Gilead," or "the Company" or "Defendant") alleges as

follows:

-2-

## NATURE OF THE CASE

1.      This action is brought under the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. § 3729, et. seq.  The action arises from the Defendant's scheme to fraudulently obtain from the United States substantial sums for drugs and medicines that were billed to the United States, sales of which Defendant knew were the product of improper sales and marketing practices, material misrepresentations, and violations of various federal laws.

2.      The proximate result of Defendant's conduct is the unjust and illegal enrichment of Defendant and the waste of federal dollars.

3.      Gilead's scheme reflects a corporate culture that encouraged and promoted sales at any cost.  More specifically, the Company established and carried out a systematic effort to reward doctors with thinly disguised "honoraria," "advisory fees," "speaker's fees," "travel expenses," and similarly labeled payments.  These payments, however characterized, were in reality, *quid pro quo* inducements to prescribe increased amounts of Gilead's drugs.

4.      Further, the Company encouraged and rewarded the off-label marketing of its drugs, particularly its HIV drug Viread.  Gilead sales personnel were trained to push sales of Viread for non-approved uses, and also utilized data that had not been approved by the United States Food and Drug Administration ("FDA") in order to persuade physicians to prescribe Gilead's drugs.  Company executives were aware of and approved this "sales-at-any-cost" approach.

-3-

**THE PARTIES**

5.     Plaintiff/Relator,                                                    is a resident of

                       resume is attached hereto as **Exhibit A.**          was employed by Gilead

in various capacities between                         , including as a Therapeutic Specialist (drug

salesperson).           was a member of

                                        As a result o'          ' employment by Gilead,

became aware of the fraudulent acts and practices described in this Complaint.

6.     Defendant, Gilead, is a Delaware corporation, with its headquarters and principal

place of business in Foster City, California.  Gilead is a pharmaceutical company engaged in the

research, development, manufacture and marketing of drugs, including a number of leading

biopharmaceutical HIV drugs and hepatitis drugs.

7.     Gilead employed this strategy of paying and incentivizing physicians, hand-in-hand

with its strategy of off-label marketing, with each strategy complementing and reinforcing each

other, in order to achieve increased prescriptions of Gilead drugs.  This process benefited the

doctors, who availed themselves of payments and perquisites; the Gilead sales representatives,

who received increased commissions and incentives based on increased prescriptions within their

sales territories; and, of course, Gilead itself, which enjoyed significantly higher revenues as a

result.  Gilead's strategy did not benefit the patient community, and it inured to the great detriment

of the United States government, which footed the bill for most of the increased prescriptions.

-4-

## SOURCE OF PLAINTIFF'S ALLEGATIONS

8.  The information related in this Complaint is derived from the original and first-hand knowledge and information of       supplemented by       counsel's additional factual investigation.

9.

## JURISDICTION AND VENUE

10.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 31 U.S.C. §§ 3729-33 (False Claims Act).

11.  In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state created claims pleaded or which may be pleaded, to the extent that these claims arise out of a common nucleus of operative facts.

12.  This Court has personal jurisdiction over the parties, because Gilead does business within this District.

13.  Venue is proper within the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because Defendant has its headquarters in this District, and many or most of the acts and practices complained of occurred in the District.

-5-

## FRAUDULENT CONCEALMENT -
## TOLLING OF STATUTE OF LIMITATIONS

14.     To cover up the scheme and actions described in this Complaint, Gilead took affirmative action to conceal its overbilling of the United States government, remaining silent when required to speak and failing to disclose material facts despite its duty to do so under the terms of its contracts with the United States and under the United States False Claims Act.

15.     Because Gilead withheld and concealed all information about its fraudulent billing practices, the United States was prevented from discovering Gilead's malfeasance, despite its exercise of reasonable care and diligence.

16.     At all material times, Gilead had knowledge of its actions and of the facts giving rise to the claims asserted in this Complaint.

17.     At all material times, Gilead concealed material facts from the United States by withholding information about its billing practices, by continuing to represent and imply that it was billing the United States consistent with the law and consistent with its affirmative contractual representations, and by failing to disclose the overbilling of the United States, despite its obligation under law to do so.

18.     Until the recent disclosure, in connection with the filing of this Complaint, of the facts surrounding Gilead's overbilling of the United States, the United States did not know, and in the exercise of reasonable care and diligence could not have known, of Gilead's unlawful conduct.

19.     Until the recent disclosures of Gilead's misconduct, no facts were known to the United States sufficient to put it on notice that it had suffered injuries as a result of Gilead's wrongful conduct.

-6-

### AGENCY ALLEGATIONS

20.     Gilead and its employees and any others carrying out the scheme alleged in this Complaint (and each of them) were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of Gilead, and each was, as such, acting within the course, scope and authority of said agency, employment and/or joint venture and was acting with the consent, permission and authorization of Gilead.  Gilead ratified and approved all actions in furtherance of the scheme alleged in this Complaint by such agents, servants, employees, successors, assignees, transferees, and/or joint venturers.

### RELATOR :

21.             ʾas employed with Gilead from                    as a Therapeutic Specialist.  In this capacity         vas responsible for promoting, marketing and selling Gilead products, namely its HIV drug, Viread (tenofovir disoproxil fumarate) and worked with a variety of healthcare professionals, including doctors, nurses, social workers and patients.        ʾ was primarily responsible for covering the                              markets.

22.         also was a member of

officers and executives, including, but not limited to, Michael Inouye, Gilead's Senior Vice President of Commercial Operations, James Meyers, Gilead's Vice President of U.S. Sales and various [1]

–7–

23.     Over the course of      employment with Gilead,        attended and participated in numerous national and regional Gilead meetings, wherein Gilead executives specifically discussed the promotion of Viread.  At these meetings, as well as at other times,         and other therapeutic specialists were encouraged to induce physicians to increase their prescriptions of Gilead drugs, especially Viread, by offering the physicians cash payments, free travel, luxury lodging and gourmet meals.

24.     In addition,         was provided with detailed "off-label" information for Viread and told, both expressly and impliedly, to use that information to aggressively promote and sell Viread despite the fact that those very Gilead executives knew that such "off-label" marketing violated the FDA regulations.  Further, at various times during      employment with Gilead, · was specifically instructed by Gilead executives to teach and train other members of its sales and marketing staff how to improperly and illegally market Viread by way of "off-label" information, as discussed in more detail below.

## SUBSTANTIVE ALLEGATIONS

I.    **GILEAD'S IMPROPER PAYMENTS AND INDUCEMENTS TO PHYSICIANS**

A.    **Overview Of Improper Payments**

25.     In the early to mid-2000s, Gilead was faced with intense competition within the pharmaceutical industry, especially in the area of antiretroviral and other HIV/AIDS drugs.  The stakes were huge, as there was a vast, lucrative market for such drugs.  In order to increase sales of its drugs, and thus its revenues, Gilead established and implemented a strategy of paying doctors in order to influence their prescribing decisions, namely, to increase the prescriptions of Gilead's drugs, most significantly Gilead's flagship HIV drug, Viread.

–8–

26.     Gilead implemented this strategy through a series of payment schemes that had the desired effect of rewarding those doctors who were big prescribers of Gilead's drugs and encouraging other doctors to increase their prescriptions of Gilead drugs. These payment schemes were characterized as "honoraria," "speaker's fees," "travel expenses," and similar euphemisms. However they were characterized, these payments, in reality, were *quid pro quo* inducements to physicians to prescribe increased amounts of Gilead's drugs, both in general and relative to its competitors' drugs.

27.     These payments were improper and violated applicable sales and marketing, educational, accreditation, and ethical guidelines, statutes, rules, standards and policies, including but not limited to those promulgated by the FDA, the Accreditation Counsel of Continuing Medical Education, the Accreditation Council for Pharmacy Education, and the Pharmaceutical Research and Manufacturers of America.

28.     Based on        personal knowledge and on interviews with former employees of Gilead with personal knowledge and involvement, Plaintiff has discovered additional evidence relating to Gilead's sales practices during these former employees' tenure at Gilead.

**B.**     **Specific Information Of Former Employees Regarding Improper Payments**

   **i.**     **Information Provided By A Former Regional Trainer**

29.     A former regional trainer, who worked at Gilead for several years through October 2004, indicated that doctors were receiving "exorbitant" honorariums from Gilead to attend dinner presentations, often arranged through a third-party company, ABcomm, Inc. ("Abcomm") (www.abcomminc.com). ABcomm organized dinners, speaking engagements, and other events

which doctors were paid to attend, ostensibly to learn about Gilead's products. The same doctors frequently attended multiple events, receiving a fee each time.

30.     This witness indicated that each dinner featured a Gilead medical science liaison ("MSL") who was trained to explain the benefits of Gilead's drugs. This MSL was typically a physician who was paid by Gilead to learn about its products and then discuss them with other doctors at these dinners.

31.     Gilead supplied Abcomm with a "huge budget" to plan and invite selected doctors to these presentations. ABcomm was supposed to invite the doctors to these dinners, but often Gilead sales representatives also handed out invitations. Doctors were paid at least $750 to $1,500 to attend an event. ABcomm provided the payments to the doctors for attending and was reimbursed by Gilead.

32.     This witness indicated that Gilead also compensated physicians through consulting/advisory meetings. These meetings consisted of gatherings of physicians for Gilead to hear their feedback on Gilead's products. In theory, they were "focus groups." According to this witness, these "focus groups" were a joke, because Gilead did not capture the feedback or process any of the information gathered.   Moreover, these meetings were organized by sales representatives.

33.     This witness attended these events and handed out honorariums to each doctor that attended. These fees ranged from $500 to $700 per physician per event. There was no limit to the number of times a physician could attend one of these meetings. Typically, a MSL from Gilead facilitated the consulting/advisory meetings. If an outside physician trained by Gilead facilitated a meeting, he or she might make close to $2,000 for the day.

34.    This witness indicated that    believes that ABcomm was "looking the other way" when doctors received "outrageously high honoraria." Although Plaintiff does not have financial records reflecting sums paid by Gilead to ABcomm,    is informed and believes that these sums were considerable.

ii.    **Information Provided By A Former Sales Representative**

35.    One former Gilead sales representative was employed with Gilead from 2003 until June 2006, and has been employed with top-tier pharmaceutical companies for 23 years. During tenure, Gilead largely failed to comply with recently enacted guidelines and regulations capping the amounts that pharmaceutical companies could spend on marketing to the medical community.

36.    This sales representative sold the HIV "specialty medications" Viread, Tenofovir and Truvada.    explained that    sales territory was extremely difficult because it encompassed four states that had low incident rates of HIV, including

By contrast, sales representatives in San Francisco, for example, had more doctors who treated HIV in "two square blocks" than this representative did in one of    states. Gilead needed to induce doctors to prescribe its products versus their competitors' products, especially in certain of the more challenging markets for its drugs.

37.    This sales representative indicated that Gilead's "Speaker's Program" was another program designed to increase the prescribing of Gilead's drugs. Gilead would hire and train a doctor to speak to a group of approximately 50-60 doctors regarding one of its drugs, such as Viread. A Speaker's Program was usually held at night and a gourmet dinner was served. There were no limits on the number of programs attended, and many doctors attended these events

–11–

repeatedly, lured by the free food. These doctors were referred to internally at Gilead as "professional dinner attendees," or "PDAs." The topics typically presented included a general update on the treatment of HIV and infectious diseases and related recent medical advances, and a discussion of why Gilead's drug was the most appropriate and surpassed the competition's offerings.

38.     This sales representative also knows that Gilead flew willing physicians to Phoenix and Los Angeles for training to lead Speaker's Programs. Once these physicians were trained, Gilead was required to use them as speakers at least twice a year. Gilead, however, intentionally trained more physicians than were needed for this role. As a result, most physicians were not required to lead a Speaker's Program. The witness suggested that Gilead's and/or ABcomm's records likely would reflect that many more physicians received training than could be expected to speak in a given year. The sales representative indicated that this was a way for Gilead to pay off doctors by offering them luxurious trips, with nothing required in exchange – as, the witness put it, the idea was to "train them, but to not * them."      suggested that the physicians, grateful for having been "trained," and with at least the *prospect* of receiving future speaking fees, naturally tended to increase their prescriptions of Gilead's drugs.

39.     This former employee stated that each physician would get between $1,500 and $10,000 for each speaking engagement. If a particular physician was widely known, such as the well-respected HIV physician from Boston, Dr. Cal Cohen, the physician would receive a higher fee because he or she was likely to draw a larger audience and also would have more influence on that audience. Thus, this former employee indicated that      and the other sales representatives sought high profile physicians to speak at their programs, even if they cost more.

-12-

40.     In addition, this witness stated that the sales representatives were heavily involved in setting up the speaking engagements. If a sales representative wanted to organize a Speaker's Program,     worked directly with ABcomm to arrange the site, the guest list, and any additional logistics such as audio visual equipment. Like other sales representatives, this sales representative attended the Speaker's Programs that     organized. Thus, the nominal medical educational aspects of these programs were driven by Gilead's sales imperative.

41.     Finally, this sales representative also indicated that doctors also profited from Gilead by agreeing to set up drug studies using patients from their practices.     recalled that the doctors were paid to oversee and run the studies, although the patients did not receive any compensation. One study might include 100 of the participating doctor's patients who might be asked to monitor their side effects from Gilead's drugs.

### iii.     Information Provided By A Former Executive Assistant

42.     Another former employee was an executive assistant at Gilead from 1999 through 2001 and reported directly to George B. (Barry) Herron, Gilead's former Vice President of International Sales and Marketing, who, before     termination in 2001, had direct working relationships with Gilead's senior management. (Herron previously had been Vice President of Sales and Marketing at NeXstar Pharmaceuticals, which Gilead apparently had acquired in 1999.)

43.     On at least two occasions during     two-year tenure, this former employee was tasked with organizing hospitality suites for doctors attending major international medical/pharmaceutical conferences in Toronto and San Francisco, as well as acting as ' at the hospitality suites. The hospitality suites, which were extravagant, were located in luxury

–13–

hotels. The suites were open for breakfast, lunch, and "happy hour" and featured gourmet food and drinks.

44.     This witness indicated that the doctors in attendance were Gilead's invited guests and that Gilead was responsible for paying all of these doctors' travel and lodging expenses.     also indicated that Gilead paid doctors to attend the conferences, including "doctors from around the world" (including Italy and Germany).

45.     This employee also was responsible for collecting the expense reports from the Gilead sales representatives who reported to Herron.

### iv.     Information Provided By Another Former Sales Representative

46.     Another former employee, who has many years of experience in the pharmaceutical industry, was a sales representative for Gilead from March 2005 until January 2006.        boss, Jason Howard, is still employed at Gilead.        indicated that Gilead was able to compensate physicians in ways that "were not always in compliance," through Speaker's Programs, Advisory Boards, and Continuing Medical Education ("CME") programs.

47.     This former employee confirmed that the "Speakers Bureau" or "Speaker's Program" was a way for Gilead to entice physicians to both promote and prescribe their drugs. Gilead would pay to send a physician for an overnight stay to, for example, Las Vegas or New York, where the physician would be put up in luxurious accommodations and would receive "training" by a Gilead medical liaison regarding Gilead's latest drugs. The medical liaison was typically a physician who was employed by Gilead. Gilead paid for all travel, lodging, meals and other expenses pertaining to the training of speakers.

–14–

48.    Like the other witnesses, this witness also understood that Gilead's "speaker training" was a disguised program to market Gilead drugs to doctors by sending them on fully-paid luxury junkets to desirable locations. Under industry guidelines, Gilead was supposed to utilize trained speakers at least two or three times per year. However, "there were too many names on that list," and Gilead did not ensure that the trained physicians actually spoke. The physicians that Gilead trained to speak were more likely to prescribe Gilead drugs to their patients. Thus, the more physicians who Gilead trained to speak, the more physicians would prescribe Gilead's drugs, regardless of whether they ever were asked to speak.

49.    This employee indicated that physician speakers who actually *did* speak also received generous compensation. In addition to fully-paid travel expenses,      recalled physicians receiving anywhere from $1,000 to $5,000 for each speaking engagement.      confirmed that ABcomm was the vendor responsible for organizing Speaker's Programs and CME classes.

50.    The sales representatives also played a dominant role in the Speaker's Program. If a sales representative wished to induce a particular physician to increase his or her prescriptions, he would "host" a Speaker's Program. The sales representative would identify a speaker and then work with ABcomm to organize the logistics pertaining to the event. The ABcomm representative would ask the sales representative, "How much does your speaker want?" ABcomm then "cut the checks based on what the 'reps' told them." There was no standard fee; rather the fee was up to the Sales representative. The control and discretion exercised by non-medical professionals at Gilead starkly illustrates that the Speaker's Program primarily was a system for disguising monies paid to physicians to induce them to increase their prescriptions of Gilead products.

51. This witness added that the choice of speakers and the amount for speaking fees were not determined by medical or community needs, but rather by the potential prescription profits that could be generated by the particular physician. For example, a physician from an prestigious medical school would receive significantly more attention than an "inner-city physician." Thus, a physician treating HIV patients in Washington, D.C.'s Southeast quadrant (a predominantly lower income community) was "never invited to speak." Instead, the physician from Georgetown was chosen.

52. Some physicians were trained to speak, but were never asked to speak, as discussed above. However, there was no cap on the number of times a particular physician spoke. If a particular physician wrote a lot of prescriptions, he would be asked to speak more frequently. If a physician spoke frequently, he generally wrote more prescriptions. As discussed, a speaking physician could command a significant speaking fee, approved by the sales representative.

53. Whether characterized as a strict "quid pro quo" or otherwise, the effect of these practices is unmistakable and undeniable. The physicians were incentivized to train as speakers to receive luxury vacations and potential future speaking fees, and those who actually spoke did, in fact, receive rich speaking fees. The sales representatives, for their part, were incentivized to recruit and approve physicians for speaker training and speaking engagements, in order to cultivate and grow prescriptions of Gilead drugs.

54. In addition, this employee explained that Gilead's sales representatives from all over the U.S. were in constant communication with each other and often would "pay each other favors." For example, a representative from one region might say to one from another region, "I have a speaker that I want to promote; I need him to write more scrips." Essentially, that

–16–

representative was asking the colleague to request the physician from their area as a speaker so that the first representative's sales numbers would increase. (The sales numbers would increase because, as stated above, when a physician is asked to speak, he or she typically increases the number of prescriptions written.) Moreover, sales representatives wanted speakers from other regions because they would be more of a draw than a local physician. If a physician from Boston spoke at a Speaker's Program in Seattle, it was likely that few in the audience had ever heard that person speak. This practice was common.

55.      This witness also confirmed that, in addition to Speaker's Bureaus, Gilead also relied on Advisory Boards and CMEs to provide remuneration to physicians in exchange for increased prescribing of Gilead drugs. An Advisory Board was a type of focus group organized by Gilead purportedly to obtain a physician's first-hand opinion of Gilead's newest data and related marketing practices. Physicians received an honorarium for attending this all-day event. Plaintiff is informed and believes that some of these physicians were also trained speakers and that there was no limit on the number of times a physician might attend an Advisory Board.

56.      CMEs, which were organized by ABcomm, involved medical education programs for which the physicians received continuing education credits. As with other benefits provided by Gilead, when a physician received credits for attending a Gilead-sponsored CME program, it was likely that that physician would write more prescriptions for Gilead's drugs.

### v.      Information Provided By A Former Manager In Sales Training

57.      Another former employee was a Manager in Sales Training at Gilead from 2001 until 2005.      most recent responsibilities at Gilead entailed developing and managing product

–17–

training for the drugs Viread, Truvada and Hepsera. This former employee reported to Ken Kieswetter, who in turn reported to Jim Meyers, Vice President of U.S. Sales.

58.     This witness confirmed that Gilead provided physicians with training opportunities so they could get on the Speaker's Program list and that the physicians were flown to Las Vegas or New York and given "lavish accommodations." Once a physician was trained, Gilead was supposed to use the physician for a Speaker's Bureau two or three times in a year. However, as other witnesses have confirmed, there were too many speakers for the sales representatives to utilize in one year. This witness also confirmed that sending a physician to training was one way to help insure that that physician would increase the number of "scrips" written for Gilead drugs. In addition, Gilead paid "high fees" to physicians in "unrestricted grant fees."

59.     The witness offered additional examples of what    considered as Gilead "crossing the line" in providing compensation and incentives to physicians:

- In 2004, a Gilead sales representative was touted as a "success story" at a national sales meeting because she paid for a press box at a Titans game in Tennessee and invited select physicians in her territory to the game. Consequently, the physicians wrote "more scrips for our drugs." The witness stated that this sales representative "was literally put on stage and praised" at a national sales meeting, even though her actions were improper.

- In 2003, a sales representative named Jennifer Tarner bragged about handing out $100 bottles of wine to physicians in her San Diego territory. This violated FDA guidelines, which among other restrictions, provide that any gifts must be functional to a physician's office.

–18–

60.     This witness indicated that John Martin, Gilead's Chief Executive Officer, was present at most of the sales and company-wide meetings Gilead held during his tenure at the company.

### vi.     Information Provided By A Former ABcomm Project Manager

61.     Another witness interviewed on Plaintiff's behalf was a Project Manager for ABcomm.   left that company several ago to start   own medical educational ("MedEd") firm.   described ABcomm as a MedEd firm, as well. This person explained that ABcomm and   company are competitors in the marketplace as vendors to pharmaceutical companies. As vendors, they might set up CMEs, Speaker's Bureaus, and other events that include opportunities for physicians to learn about the drugs manufactured by the MedEd firms' clients. Typically, a vendor such as ABcomm pays for all of the logistics up front, including paying physicians to speak, and then bills the pharmaceutical company later.

62.     This person did not handle the Gilead account, but   worked across the hall from Karen Michael, who handled the Gideon account, was terminated from ABcomm. This person indicated that when Gilead or any pharmaceutical company hired ABcomm to pay doctors exorbitant fees, this was "money laundering" because it was a clever way to break the rules by having the pharmaceutical companies use vendors to overpay physicians. The vendors "look the other way," in   opinion. When asked why pharmaceutical companies would "overpay" a physician to speak,   stated that it was a way to guarantee that the physician will use his or her influence to ensure that more of his or her colleagues prescribe that drug.   indicated that the industry standard for fees paid to a physician to speak at a Speaker's Program is about $2,000 per event. If a physician can get more, "it's a cash cow for them."

–19–

63.     This witness suggested that Karen Michael had been highly disturbed by Gilead's policies and practices with respect to payments to doctors.          added that ABcomm supported Gilead's policies and practices.

## II.     THE IMPROPER OFF-LABEL MARKETING

### A.     FDA Regulation Of Off-label Marketing

64.     When a pharmaceutical manufacturer markets and promotes its products, it is required do so in accordance with the mandates and limitations set forth in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Sec. 301 *et seq.*, and its implementing regulations.  The FDA monitors and enforces the Federal Food, Drug and Cosmetic Act through its Division of Drug Marketing, Advertising, and Communications (the "DDMAC").

65.     When promoting a FDA approved drug, the manufacturer must follow certain guidelines contained within the prescribing information contained within the package inserts.  For example, every HIV/AIDS drug approved by the FDA is accompanied by prescribing information contained within its package insert, which is provided to both doctors prescribing the drug and to patients using the drug.  This prescribing information is FDA-approved and contains important information about the particular drug, such as approved and intended uses and a description of side effects.

66.     Sales and marketing representatives of pharmaceutical manufacturers are not permitted to promote their company's FDA-approved drugs with information not found in the prescribing information contained in the package insert.  Doing so is referred to as marketing "off-label."  For example, a company may develop a drug that is FDA-approved to fight HIV/AIDS, but post FDA-approval clinical studies demonstrate that the drug also is effective at fighting

—20—

cancer. Because no information regarding the drug's ability to fight cancer is contained in the FDA-approved prescribing information, the company's sales representatives are not permitted to advocate or even mention the drug's efficacy against cancer. Rather, they must stay within the prescribing information and cannot sell off-label.

67.     The prohibition against sales and marketing personnel promoting an FDA-approved drug with off-label information does not apply if a physician or other medical professional first signs a written form specifically requesting such information. For example, a doctor treating a patient  who has both HIV and cancer may notice that the patient's HIV medication seems to positively impact the patient's cancer symptoms. The doctor could request in writing (on what is known as an "inquiry form") from the pharmaceutical manufacturer, via the manufacturer's sales and marketing representatives, the results of any studies detailing the drug's interaction with cancer,  even if those are ongoing, are not FDA-approved, and are outside the prescribing information. At Gilead, these inquiry forms were responded to by Gilead's Medical Sciences clinical staff, rather than sales and marketing personnel.

68.     Absent a medical professional's request for off-label information, it is a direct violation of FDA rules and regulations for a drug company to promote a drug with such off-label information. Thus, a medical professional must request off-label information before the manufacturer's sales representatives can supply it. As will be discussed in more detail below, Gilead's sales and marketing officials were encouraged to promote Gilead's drugs for off-label uses and based on off-label studies and information, and then to "cover themselves" by obtaining an inquiry form after the off-label information was provided. This was done in order to boost the representative's and Viread's sales, and to gain an advantage over the competition.

–21–

### B.    Gilead's Campaign Of Illegal, False And Misleading Advertising

69.    Gilead has repeatedly and consistently promoted Viread, its HIV/AIDS drug, in an unlawful, false, and misleading manner.  Specifically, since at least September of 2001, Gilead implemented a scheme to promote and market Viread with off-label, false, and misleading statements in violation of the Food, Drug, and Cosmetic Act.  As described in more detail below, Gilead officers and executives knew that Gilead's Viread sales and marketing team was routinely and consistently provided with off-label information for Viread, and was encouraged, expected, and directed to use that off-label information in Viread sales presentations, even if medical professionals did not ask to see that information first.  This process was inculcated in Gilead's sales and marketing staff and in Gilead's overall corporate culture, in order to provide a competitive edge.

70.    As a Therapeutic Specialist in Gilead's                           the Plaintiff reported directly to                                                          In turn,

reported to James Meyers, the Vice-President of U.S. Sales, who reported to Shay Weisbrich, Gilead's Vice-President of Sales and Marketing.  Both Meyers and Weisbrich were members of Gilead's Senior Management Team.  Ultimately, Weisbrich was responsible to Mike Inouye, Gilead's Senior Vice-President of Commercial Operations and a member of the Executive Committee.  Inouye reported to Gilead's senior officers and to the Board of Directors.

### i.    Circulation Of The FDA Briefing Document

71.    In an effort to win FDA approval for Viread, Gilead presented the FDA with a thick "book" of Viread clinical data and information, titled the FDA Advisory Committee Briefing Document (the "FDA Briefing Document").  However, much of the information found in the FDA

-22-

Briefing Document is not found in Viread's prescribing information and thus is considered off-label. For example, the FDA Briefing Document contained information regarding Viread's impact on bone density and the incidences of bone fractures resulting from Viread use. This information was never included in the prescribing information, so Gilead's sales team was not supposed to market Viread on the premise that it was superior to other HIV drugs on issues of bone density.

72.          has personal knowledge that Gilead presented the FDA Briefing Document to the FDA.          attended a company-wide national meeting in Miami, Florida in the Fall of 2001, during which members of Gilead's sales and marketing team viewed, via teleconference, Gilead's executives' and clinical researchers' presentation to the FDA Advisory Committee.

73.     Present at the FDA presentation in Washington D.C. were John Martin, Mark Perry, Norbert Bischofberger, Michael Inouye, William Lee, and John Milligan, among others. Each of the Gilead senior employees who personally attended the FDA briefing knew that the FDA briefing was also being "attended" by Gilead's sales and marketing staff in Miami via teleconference. The teleconference in Miami was attended by, among others, James Meyers, Shay Weisbrich, Debbie Fletcher, and Sheryl Meredith. The purpose of the Miami teleconference was to allow Gilead's salespeople and marketing department to become familiar with the materials presented by Gilead to the FDA, so that those materials could be used to market Viread, even though some of the materials would clearly be off-label. Thus, every employee and executive involved in the FDA presentation knew that it was Gilead's intent to utilize the FDA Briefing Document and related materials in order to market Viread.

74.     Although Gilead's clinical researchers created the FDA Briefing Document for the FDA, the book was provided to Gilead's sales and marketing team in September of 2001.

-23-

According to          the leaking of the book was intended to supply Gilead's sales force with a non-FDA approved resource to promote Viread with information not ultimately found in the prescribing information.

75.

supervisor at Gilead, instructe          in a telephone conversation to make numerous copies of the FDA Briefing Document and distribute it to Gilead's Viread sales and marketing team. According to      , the sole purpose of instructing          to copy and distribute this information was to provide it to Gilead's sales force so that they could market Viread with off-label information, in an attempt to increase Viread's sales.          later approved the expense report submitted by      for this work.

76.   After making their presentation to the FDA, Gilead's officers, executives, and clinical personnel, including John Martin, Mark Perry, Norbert Bischofberger, Michael Inouye, William Lee, and John Milligan, traveled to Miami to join Gilead's national meeting already in progress.          specifically remembers attending meetings in Miami at which      and other Gilead sales and marketing team members were provided with off-label information and instructed, with a "wink and a nod," to use that information in their efforts to sell Viread. In addition,          specifically remembers John Martin attending those very same meetings in Miami and being at meetings during which Gilead's sales and marketing team members were given these instructions.

ii.   **Gilead's Methodology To Hide Its Off-Label Marketing**

77.   Gilead's senior officers at all relevant times knew that off-label marketing was illegal. For that reason, Gilead often combined its "wink and a nod" directives, including

–24–

providing off-label materials for use by its sales force, with perfunctory "reminders" that such materials should not be provided to Gilead's customers.

78.    Gilead, in effect, tried to "cover its tracks" by directing off-label marketing but combining those directives with a "paper trail" that could be used in the event it was ever caught. Since Gilead's scheme of illegal marketing has now been exposed, and Gilead has been caught, it will no doubt seek to rely on its "paper trail" in order to attempt to avoid liability.

79.    For example, one of Gilead's favorite tricks was to circulate a memorandum with off-label materials attached. The body of the memorandum would note "for internal use only," but none of the attached off-label materials would contain any such limiting language. The sales and marketing staff was then directed, expected, and encouraged to remove the off-label materials from the memorandum and use them to market Viread off-label.

80.    Thus, even before the FDA approved Viread in October of 2001, Gilead and the planted the seeds of fraud, by way of off-label information, that would lead to the artificial inflation of sales of Viread. The use of off-label information, and the resulting artificial inflation of sales of Viread, continued at least through the end of          tenure at Gilead in .

     iii.    **The December 2001 Gilead National Meeting; The Misuse Of Study 903 And Study 902**

81.    During December of 2001, Gilead hosted another national meeting for its employees. At this meeting,          says that Gilead was celebrating the FDA's regulatory approval of Viread in October of 2001, and further readying itself for an aggressive (indeed

–25–

illegal) marketing campaign. The weeklong December 2001 national meeting took place in Scottsdale, Arizona at the Phoenician Hotel.

82.    During the 2001 Arizona meeting,        , like other members of Gilead's sales and marketing team, attended numerous Viread marketing presentations.        specifically remembers that John Martin, John Milligan, and Mark Perry also attended these same meetings. During these marketing presentations in Arizona, Gilead's sales staff was provided with updates regarding various ongoing Viread clinical trials, which results, unless and until approved by the FDA, were off-label materials. For example,        recalls attending presentations at which and other Viread sales and marketing people received updates concerning Study 903 and Study 902, and discussions regarding Viread's resistance profile and potential use to combat Hepatitis B, even though this updated information was not found in Viread's FDA-approved prescribing information, was not approved by the FDA, and was, therefore, off-label.

83.    At the time of the FDA Briefing Document, Study 903, had not been completed. In fact, it was described in the FDA Briefing Document under the heading "Plans for Further Development." Study 903 was designed to evaluate the safety and efficacy of Viread versus Stavudine, another HIV/AIDS drug manufactured by Bristol-Myers Squibb. In the FDA Briefing Document, Gilead mentioned that Study 903 had 601 patients, that 48-week data was expected to be available in early 2002, and that the study would continue after the 48-week mark was hit. By providing Gilead's sales and marketing team with Study 903 information in December of 2001, Gilead was providing off-label information on a study that was not even scheduled to reach completion until early 2002.

–26–

84.     Study 902 was used in a similar fashion. The primary objective of Study 902 was to evaluate the long-term safety of three different doses of Viread in patients and to confirm the results of previous efficacy tests. The 189 patients in Study 902 had to already be on HIV drug therapy, consisting of no more than four active medications, for at least eight weeks prior to enrollment. Study 902 was designed to select and study a population that was representative of HIV-infected patients with a "detectable viral load" and who were already on several types of HIV/AIDS medications. According to Gilead, the selection criteria depended upon the amount of the HIV virus present in the patient's body and what medication the patient was currently taking. Other requirements related to overall health, including renal, hepatic, and hematologic function. Study 902 was included in the FDA Briefing Document, but any results that were not approved by the FDA, or updated results from on-going patient studies, would be considered off-label.

85.     Thus, providing Gilead's sales and marketing staff members with updated, off-label information on Study 902, would permit them to opine on the long-term safety of Viread in patients also taking other HIV/AIDS medications, despite the fact that the FDA had not approved such updated information. According to         long-term safety data for any HIV medication is invaluable for marketing such drugs because many HIV drugs are new to the marketplace, creating an inherent lack of long-term data.

86.         recalls that .    and all other Viread sales and marketing people were encouraged, expected, and directed to use this additional off-label information to promote Viread, in violation of FDA rules and regulations. At this meeting,        witnessed first-hand, along with Martin, Milligan, and Perry, among others, Gilead's sales and marketing team being given off-

–27–

label information so that they could promote Viread in a false and misleading manner in an effort to boost sales and gain an unfair advantage over its competitors.

87.            recalls exactly how the "wink and the nod" technique would operate.  At meetings, such as the December 2001 Arizona meeting, the sales and marketing team would sit for large meetings during which off-label data was presented.  Then, the sales and marketing team would be broken down into smaller groups, and each of these smaller groups would have their own meetings.  It was in these smaller sessions that          would receive specific off-label instructions.  Typically, the sales and marketing team would then reconvene at a large meeting, where the message given by Gilead was to sell Viread based on what they had been told.  In this manner, Gilead could simply present the off-label material and then quietly instruct, behind closed doors, its sales and marketing people to sell off-label, while continuing to cover itself with a "paper trail" at the larger meetings.

88.            states that at the Arizona national meeting, Michael Miller, Chief Virologist and Director of Viral Resistance Research with Gilead, made presentations to Gilead's sales and marketing team, attended by          , Martin, Milligan, and Perry, among others.  During these meetings, Miller talked about off-label clinical data for Viread, such as HIV instances of resistance – information that went well beyond Viread's product labeling and prescribing information.

89.            also recalls Gilead's Viread sales team being instructed during the Arizona meeting to steer Viread sales presentations towards off-label information.  According to          and the sales team were told to do this by Debbie Fletcher, Gilead's Director of Marketing, while Martin, Perry, Milligan, and Bischofberger, among others, were present.

–28–

   iv. **The Chicago Conference In December 2001: Gilead's Improper**
     **Statements**

   90.  Additionally, at the 41st Insterscience Conference on Antimicrobial Agents and

Chemotherapy held in Chicago, Illinois in December of 2001, according to the FDA, Gilead made

false and misleading oral statements about Viread at its promotional exhibit. These included

statements regarding the risks associated with taking Viread and statements regarding the efficacy

of Viread. As detailed later in this Complaint, the DDMAC learned of Gilead's statements at the

Chicago conference and issued a letter (the first of several such letters) to Gilead warning that this

practice was illegal, ordering Gilead to cease and desist, and demanding a written response from

Gilead condemning this practice.

   v. **Gilead's January 2002 Regional Sales And Marketing Meeting: The**
     **Misuse Of Study 907**

   91.     also attended a regional Gilead sales and marketing meeting, also in

Chicago, on January 30 and 31, 2002.  recalls that the regional meeting was called because

Viread sales had started slowly in the[1]   region. In that meeting,

         James Meyers, Gilead's Vice President of U.S. Sales, Kristin

Bennet, Gilead's Director of Training, and Mark Bernstein, one of Gilead's Medical Science

Liaisons, made it clear to Gilead's   Therapeutic Specialists (as had been done at the

Arizona national meeting) that it was both acceptable and encouraged to violate FDA regulations

by intentionally marketing Viread with off-label information, prior to a request for such

information.  recalls that the instruction to market Viread with off-label information in

order to boost sales and meet internal sales forecasts given by Gilead executives at the Chicago

regional meeting was the same instruction echoed at several national meetings.

–29–

92.     At the January 2002 Chicago regional meeting,          recalls being given updates regarding Viread's resistance profile and the progression of Studies 902 and 907.  As described above, Study 902 was designed to test the long-term efficacy of Viread in patients with HIV who were already on other HIV/AIDS medications for at least eight weeks prior to enrollment in the study.  The primary objective of Study 907 was to evaluate the safety and efficacy of Viread in a large population.  Study 907 involved 552 patients who were given varying doses of Viread and were deviating from their then-current intake levels of other HIV/AIDS drugs.  As with Study 902, Study 907 was designed to select patients who had experience with other HIV/AIDS drugs and had a "detectable viral load."  According to Gilead, the results of Study 907 demonstrated that Viread had significant anti-HIV ability.

93.     The presenters at the January 2002 Chicago regional meeting discussed unproven and non-FDA approved theories of how Viread can essentially remain dormant in a healthy cell, lying in wait for the HIV virus to attack the cell.         states that such information was used to give Gilead's sales and marketing team additional firepower to combat their competition in the marketplace and boost Viread's sales, even though that information was not in the prescribing information.

vi.     **Gilead's Express Instructions To Illegally Market Off-Label**

94.     Prior to the January 2002 Chicago Meeting, James Meyers, Gilead's Vice-President of U.S. Sales, Kristin Bennet, Gilead's Director of Training, and          Gilead's Regional Director for the          , specifically instructed          o teach other Gilead Therapeutic Specialists and marketing employees how to successfully market Viread with off-label information.

–30–

95.    Specifically,        was told that     was skilled at manipulating potential purchasers of Viread into attempting to discuss issues that required the disclosure of off-label materials, thus creating "openings" for discussion of off-label materials.        was instructed to "teach" other salespeople how to "lead" customers to these "openings."        did as    was instructed to do --    taught salespeople how to more effectively market Viread off-label -- out of fear that to do otherwise would lead to      termination.

96.    Thus, in addition to receiving additional off-label information from Gilead executives,       instructed no less than five other Therapeutic Specialists, at the request of  superiors, how to successfully market Viread with off-label information. Further, recalls that James Meyers was present while       instructed other Therapeutic Specialists on how to market off-label and told      that      had done a good job of training Gilead's other Therapeutic Specialists in off-label marketing techniques.

### vii.    Gilead's February 2002 Field Advisory Committee Meeting: Experience Is Typical Of Gilead Nationwide

97.    On February 11 through February 13, 2002,        attended a meeting of Gilead's Field Advisory Committee in New York City at the offices of Harrison & Star, Gilead's advertising agency for Viread. This was   rst meeting with the Field Advisory Committee, a select group of Viread sales and marketing team members from around the country that was scheduled to meet every six weeks to discuss Viread sales with certain members of Gilead's executive departments. The attendees included       , five other Therapeutic Specialists, Debbie Fletcher, Gilead's head of marketing (until the summer of 2002), and John Windt, Gilead's Associate Director of Marketing. At the meeting,       recalls that the Therapeutic Specialists

--31--

were asked how they were using off-label information in the field to promote and sell Viread. This meeting of the Field Advisory Committee provides additional evidence that experience promoting Viread in the            region was similar to that of Therapeutic Specialists in other parts of the country.

98.    As at other Gilead meetings, at the Field Advisory Committee Meeting, the use of off-label information in the sale of promotion of Viread was specifically discussed and encouraged, even in the presence of Gilead's senior executives, such as Debbie Fletcher and John Windt. John Windt reported to Debbie Fletcher. Debbie Fletcher reported to Shay Weisbrich, Gilead's Vice-President of Sales and Marketing, who, in turn, reported to Michael Inouye and John Martin.

**viii.    Gilead's February 2002 Regional Meeting: Instructing Off-label Marketing Regarding Resistance Profile Data**

99.    On February 20 through 22, 2002, at another regional meeting in Chicago Illinois, Gilead's sales and marketing staff was again clearly told that this use was acceptable, and were encouraged to violate FDA rules by promoting Viread with off-label information. As with the other meetings described above,          was present and specifically provided with off-label information for Viread, and encouraged to use that information in violation of FDA rules and regulations to inflate Gilead's Viread sales.          states that at this Chicago regional meeting, Michael Miller, Gilead's Director of Virology, provided more current off-label information concerning Viread, namely, Viread's resistance profile in "treatment-experienced" versus "treatment-naïve" patients.

--32--

100.    According to          Gilead was testing Viread's levels of success in patients who had already been on HIV/AIDS medication (treatment-experienced) and comparing those results to the levels of success in patients who had never received HIV/AIDS medication before (treatment-naïve).  The purpose of such data for Gilead would be to expand the use of Viread into treatment-naïve patients, thus increasing sales.  However, the updated resistance profile data was all off-label and therefore should not have been used by Gilead's sales and marketing team to promote Viread, unless specifically requested first by a medical professional.

### ix.    The March 2002 FDA Warning Letter

101.    On March 14, 2002 the FDA/DDMAC sent an untitled letter to Gilead advising Gilead of the false and misleading promotional activities being undertaken by its representatives in violation of the Food, Drug and Cosmetic Act.  (MACMISID #10666, NDA#21-356.)  A copy of DDMAC's letter is attached hereto as **Exhibit B**.

102.    Warning letters are written communications from the FDA, in this case the DDMAC, notifying a company that the DDMAC considers one or more promotional pieces or practices to be in violation of the law.  If the company does not take appropriate and prompt action to correct the violation, as requested in the warning letter, there may be further enforcement actions without further notice.  Warning letters are issued by the DDMAC Division Director and receive concurrence from appropriate officials in the Center for Drug Evaluation and Research.

103.    According to the FDA's March 2002 letter, Gilead had falsely and misleadingly promoted Viread by stating that Viread contained "no toxicities," was "extremely safe," and was "extremely well-tolerated" despite the fact that Viread's boxed warning and FDA approved product labeling (the prescribing information contained within the package insert) contained direct

–33–

information to the contrary. Gilead further violated the Food, Drug, and Cosmetic Act by minimizing the boxed warning for Viread, and falsely and misleadingly suggesting that the drug was safer than had been demonstrated by scientific evidence. In addition, Gilead "engaged in false and misleading promotional activities about the efficacy of Viread," referring to it as being "approved for a broad indication" and characterizing it as a "miracle drug," at a time when the FDA had not even determined the clinical benefit of Viread in HIV patients.

104.     The Untitled FDA Letter ordered Gilead to "immediately cease making such violative statements" and required Gilead to submit a written response to the DDMAC describing its intent and plans to comply with the DDMAC's directives and identifying the specific date upon which Gilead discontinued its illegal promotional activities.

105.     On March 21, 2002, Gilead responded to the Untitled FDA Letter and assured the DDMAC that its illegal promotional activities would cease. Those activities did not cease, however.

106.     Both before and after the issuance of the Untitled FDA Letter, Gilead and its senior management either specifically directed Gilead's sales force to engage in the false, misleading, and illegal promotional and marketing activities described by          and in the Untitled FDA Letter , or, at the very least, knew of the improper and illegal promotional and marketing activities and, with a "wink and a nod," allowed them to continue, and ratified them.

107.     Gilead continued its improper off-label marketing, which caused massive artificial inflation of its sales of Viread and caused massive artificial increased payments to Gilead through government sponsored insurers. The end result was an illegal waste of taxpayer funds and a fraud upon the taxpayers.

—34—

x.   **Gilead Continues the Campaign of Illegal Off-label Marketing**

108.   The Untitled FDA Letter did not deter Gilead from continuing its campaign of false, improper and illegal marketing and promotional activities, despite the fact that Gilead assured the DDMAC that its illegal activities would cease. Instead, Gilead's lies continued over time, including into the second quarter of 2003.

109.   Once again at a          egional meeting, on                    2002, Gilead updated its          sales force with off-label information for the purpose of encouraging them to market the product with non-FDA approved information.          attended the       . regional meeting in          and specifically recalls receiving additional off-label updates for Viread (as        had before), which       nd the          sales and marketing team were encouraged to use to improperly promote Viread in violation of FDA rules and regulations.

110.   On May 6, 2002,          attended another meeting of Gilead's Field Advisory Committee in New York. Debbie Fletcher, Gilead's head of marketing, and Michael Inouye, Gilead's Senior Vice-President of Commercial Operations, also attended this meeting. At this meeting,          along with a handful of other Therapeutic Specialists from around the country, described to Gilead's marketing officers and executives how they were promoting Viread. Specifically,          recalls discussions of how the sales and marketing team was promoting Viread with off-label information. In fact, at the Field Advisory Committee meeting, the attendees specifically discussed clinical information that had recently been provided to physicians at a conference in Seattle, Washington. Further, the members of the Field Advisory Committee were updated with additional off-label information that Gilead would be presenting at an upcoming international AIDS/HIV conference in Barcelona, Spain in July 2002. All of this information was

--35--

off-label and not approved by the FDA, placing it clearly beyond the scope of information that should have been made available to Gilead's sales and marketing staff. The only circumstance in which a member of Gilead's sales staff should ever have the need to possess such information should be if a medical professional requests the information first.

111.    Instead, according to        , at the May 6, 2002 Field Advisory Committee Meeting, Gilead's senior executives, including Michael Inouye and Debbie Fletcher, heard Gilead's Therapeutic Specialists from across the country describe and explain how they had been promoting Viread with off-label information.

112.    From May 14th through May 17th of 2002, Gilead hosted a meeting in Los Angeles, California for its sales and marketing team from four different sales regions of the country, which included employees from Chicago, Dallas, Los Angeles, and San Francisco. At the Los Angeles meeting, there were several presentations at which Gilead's sales and marketing team from these four regions was provided with additional off-label information to be used in the promotion and sale of Viread.        recalls that Jim Meyers, Mark Perry, and John Martin were present during the Los Angeles meeting when Gilead's sales and marketing people were provided with and directed to use off-label information. In addition to updates on ongoing clinical studies of Viread, attendees at those Gilead meetings were provided with off-label clinical and theoretical information intended fore presentation at the upcoming July 2002 international meeting in Barcelona, Spain, information that should have been reserved for clinical professionals, not sales and marketing people.

113.    Thus, as with all of its other meetings, Gilead continued to inundate its sales and marketing staff with off-label information, encouraging, expecting, and directing them to use that

information to promote Viread in violation of FDA rules and regulations, as part of a company-wide effort to boost sales by any means necessary.          describes the practice of providing such information as a conspiracy to boost sales and that the conspiracy ran to the highest levels of Gilead's hierarchy, including John Martin, Norbert Bischofberger, Mark Perry, John Milligan, and William Lee, among others.

114.    On or about July 15, 2002,        had a discussion with                              in            regarding the use of off-label information.              recalls that                        wanted more sales from the '            territory and told            that if    ' used more off-label data,        would get more sales.

115.    On or about September 9th through the 13th of 2002,    '        :    attended a national Gilead meeting in Las Vegas, Nevada.            recalls that Milligan, Perry, Bischofberger, Inouye, and Martin attended the Las Vegas meeting.  Once again, as in the numerous other meetings described above, Gilead's marketing and sales team was provided with substantial amounts of off-label information to assist them in selling and promoting Viread in violation of FDA rules and regulations.  For example,          recalls attending presentations at which Gilead's Viread sales team was provided with non-FDA approved clinical data that they were encouraged to use in an effort to differentiate Viread from the competition.  Specifically, the Gilead presenters went over clinical data, not yet submitted to the FDA, which was to be presented at the upcoming Barcelona HIV/AIDS conference, as well as other new theories on Viread's resistance profile.

116.            states that all of the off-label information was presented as part of an effort to differentiate Viread from other FDA-approved HIV medications.  Without making these improper, off-label distinctions as part of its standard sales practice, Gilead would not have had

–37–

such rapid success in the promotion of Viread.  Viread sales were massively artificially inflated as a result, and payments by the United States government for the costs of the prescribed drugs also were massively artificially inflated.

117.    On or about October 10 and 11, 2002,          attended another meeting of the Field Advisory Committee at Gilead's headquarters in Foster City, California.  The meeting included James Meyers, Gilead's Vice-President of U.S. Sales, Kelly Seither, Gilead's Associate Director of Marketing, and Michael Inouye, Gilead's Senior Vice-President of Commercial Operations, as well as Therapeutic Specialists from around the country.  At the October 2002 Field Advisory Committee meeting,          and other Therapeutic Specialists were presented with information regarding Study 903, which had just hit the three-year mark.  The committee members were told how to push Viread on the marketplace with additional results from Study 903, results not found in the prescribing information and not approved by the FDA.  Thus,          attended yet another meeting at which Gilead's senior executives heard about and discussed how to use off-label information for the improper promotion of Viread.

118.    Once more, on              2002,       attended a regional meeting of the Viread sales and marketing team in              .  As with other national and regional meetings,        and the other members of the sales team were given off-label information and encouraged, with a "wink and a nod," to use such information to push and sell Viread.

119.    On November 1, 2002,          attended a national liver disease meeting in Boston, Massachusetts.  Numerous representatives from Gilead attended the meeting, including John Martin, Mark Perry, and James Meyers. During that meeting,          met with James Meyers and expressed concerns about the off-label marketing of Viread, and the prevalence of Gilead's false,

–38–

misleading, and improper sales practices. Meyers rejected          concerns regarding selling

Viread off-label and stated that          should use every piece of available information        had

to promote Viread, that  .       should sell Viread with the information presented at the national

and regional meetings, and that          should do as        was told.  (Meyers reported to Shay

Weisbrich, Gilead's Vice President of Sales and Marketing.  In turn, Shay Weisbrich reported to

Mike Inouye, who reported to John Martin and the Board of Directors.)

     120.    The last meeting          attended was a company-wide national meeting during the

week of February 17, 2003 in Orlando, Florida.          recalls attending presentations by Sheryl

Meredith, Gilead's then Head of Marketing, and Linda Cherry, Gilead's Marketing Director,

during which off-label information concerning Study 903 and Study 907 was presented.  The

information was presented to the sales staff in the form of key points from the studies.          nd

other members of the sales and marketing team were told to utilize the key points to push their

sales of Viread.          recalls that at the Orlando meeting, the presentations encouraging the use

of off-label information were less overt then they had been in the past, but that when the sales

teams met behind closed doors in smaller groups, the off-label presentations were much more

direct.

     121.    According to        , John Martin, John Milligan, Norbert Bischofberger, Andrew

Lee, and Mark Perry, among others, were in the room when the orders to market Viread with off-

label information were given by James Meyers at the 2003 Orlando meeting.

     122.    During the 15th National HIV/AIDS Update Conference in Miami, Florida from

March 31st through April 2nd of 2003, Gilead made additional false and misleading oral

representations concerning Viread in violation of the Food, Drug and Cosmetic Act.

### xi.   The July 2003 FDA Warning Letter

123.   Just as it did ever since Viread's approval in October of 2001, in the second quarter

of 2003 Gilead continued to minimize important risk information (including failing to disclose

potentially fatal risks) and to broaden the indication for Viread.  This time, Gilead's improper and

illegal practices and statements led the FDA to issue a warning letter (the "FDA Warning Letter").

(MACMISID #11723, NDA#21-356.)  A copy of DDMAC's letter is attached hereto as **Exhibit**

**C.**

124.   The FDA Warning Letter was issued on July 29, 2003 and stated that Gilead's

illegal acts were "particularly troubling because the more than 1,500 attendees of [the 15th

National HIV/AIDS Update Conference] included social workers, AIDS educators, and patients

with HIV/AIDS."

125.   As stated in the FDA Warning Letter, Gilead's lies were so severe (Gilead again

minimized important risk information and broadened the indication for Viread) that the FDA

concluded that Gilead had created a new "intended use" for Viread, causing it to be misbranded.

126.   According to the FDA Warning Letter, Gilead's repeated omissions and

misrepresentations regarding Viread caused "significant public health concerns," and led the FDA

to require Gilead to respond with a plan to address the "repetitive promotional activities."

### xii.   Gilead's Improper Use of Documents In Illegal Off-label Marketing

127.          also received numerous slides, posters, and presentation materials from the

various meetings described above.  These posters and presentations detailed the off-label clinical

updates and information being presented at a given meeting.  Typically, pharmaceutical

manufacturers stamp all such materials with a designation that they should not be used in sales and

–40–

marketing presentations, because they contain clinical research not approved by the FDA. Gilead did not do this, precisely because it was intended that these materials would be used to market Viread.

128. According to           , those materials were frequently distributed to Gilead's sales and marketing team in an effort to arm them with off-label information that they could physically show to healthcare professionals prior to any request for such information. Quite often, the posters would be distributed with an accompanying memorandum describing them as off-label; however, the posters themselves would completely lack any "off-label designation." The lack of any such designation would enable Gilead's sales and marketing team members to use the information in sales presentations without the medical professional realizing that he or she was seeing off-label information. Therefore, as it did in national and regional meetings, Gilead was able to continue its "wink and nod" tactics even with off-label posters.

### xiii.    Further Evidence Of Off-Label Marketing

### 1.    Additional Information Provided By A Former Regional Trainer

129. According to the Regional Trainer identified in Paragraphs 29-34, *supra*, dinners and other events were used not only to provide payments to physicians, but also were used as a forum to explain "off-label" the purported benefits of Gilead's drugs to those in attendance. The payments to doctors were employed in order to induce the doctors to attend sessions, where in turn, off-label information was disseminated. The MSLs used the ABcomm dinners as a forum to explain off-label benefits of Gilead's drugs. Thus, the payments along with the off-label marketing were part of an intentional, comprehensive and illegal strategy to increase prescriptions of Viread, Hepsera, and other Gilead drugs.

–41–

130.   This Regional Trainer has a wealth of information regarding Gilead's off-label marketing to physicians.   Gilead distributed among Sales representatives posters and bound notebooks containing off label information that would assist them in selling Gilead drugs.  The availability of these posters and notebooks was well-known, and the "discreet" use of these materials was encouraged.

131.   According to this former employee, sharing off-label information was "commonplace, but you could not get caught."  This employee believes      was "scapegoated" because, though      was directed to engage in off-label marketing, Gilead's senior executives did not want any negative exposure regarding their willingness to allow Sales representatives to share off-label information with physicians.  The witness was terminated              2004.    had been organizing a small Speaker's Program in         that involved five physician's assistants and one speaker.  When the speaker requested literature about off-label uses of Viread, the witness requested the documentation from      Medical Science Liaison ("MSL").  Even though      MSL provided it to         was "thrown under the bus" when senior management confronted the MSL about the off-label data that      was dispensing, and the MSL blamed the witness.

132.   Off-label usage was discussed at Speaker's Programs, but in a carefully orchestrated fashion to suggest that it arose only in a medical context raised by a physician audience member, rather than in a sales context raised by a Gilead representative.  Gilead and their trained physicians were careful.  Every Speaker's Program began with a disclaimer that off-label uses might be mentioned.  According to the witness, this disclaimer was a "cover your ass move" on the part of Gilead.  That way, if ever challenged that off-label usage was discussed, it could be claimed that the doctors were warned.  While a speaker could not raise the topic of off-label uses,

–42–

if an audience member inquired about them, "It was open season." It was apparent to the witness that the "disclaimer," if anything, was intended as a "prompt" to entice the audience to ask about off-label uses.

133. Finally, this witness added that off-label uses also were frequently promoted at the consulting/advisory meetings (the faux "focus groups") referred to in Par. 32, *supra*, though orally rather than in writing.

## 2.   Additional Information Provided By A Former Sales Representative

134. According to the former sales representative identified in Par. 35-41, *supra*, in 2004 or 2005, Gilead hired David Vance ostensibly to prohibit improprieties at Gilead, including overpaying physicians and off-label marketing activities. But Vance either "looked the other way" or just missed these practices, especially off-label marketing. The practice of off-label marketing continued to be carried out, albeit in a subtle fashion. This representative characterized the company's practice in this regard as a "don't ask, don't tell" policy.

135. At regional sales conferences and training sessions, Gilead's sales representatives were instructed to promote off-label uses for drugs at "break-out sessions," rather than during group presentations. "That's where we learned how to do it," indicated this representative. Posters created by Gilead to show how their drugs compared to the competition's drugs usually were circulated during the main sessions stamped "Do not use," meaning that the information was not approved by the FDA, was "informational," and was not to be shared with physicians. In the breakout sessions, however, usually copies of the same posters *without* the warning stamp were circulated. Those posters were handed to doctors in an effort to convince them that Gilead's drugs were more useful than the competitors' because it had alternative uses—even if those uses were

–43–

not approved by the FDA. This representative stated that     was instructed to "be careful" in circulating the posters in the breakout sessions, but that     was encouraged to use the information to increase     sales.

136.    Sales meetings occurred approximately twice a year. As recently as January 2006, this representative received off-label posters and information that .    could disseminate to doctors.     indicated that off-label information also came in "cleaned up" notebooks that were provided to sales representatives between sessions. If a notebook was handed out in a sales meeting, it would be marked in a way that told the sales representative that the information was not to be spread to doctors. However, any documentation handed out between sessions in breakout groups usually was "clean" and without warning and was intended to show to the attending doctors.

137.    This sales representative indicated that off-label activity was "prevalent" at Gilead and was encouraged by many of the "trainers" at Gilead who trained sales staff.     showed Plaintiff a Gilead "poster" that was initially distributed at the XV International AIDS conference in Bangkok, Thailand in 2004. The poster displays detailed abstracts resulting from testing of Gilead drugs and includes comparisons with competitors' products. The data contained in this document was not approved by the FDA and therefore was not supposed to be distributed to physicians. In its original form as a poster used in formal training of Gilead Sales representatives, this document was stamped with a message stating that the information contained in it should not be distributed to physicians because it was not approved by the FDA. However, copies of the document, without the warning, were disseminated during break-out sessions and were received by sales representatives. A copy is attached as **Exhibit D** attached hereto.

-44-

### 3.   Further Information Provided By Another Former Sales Representative

138.   According to the other sales representative who was identified in Par. 46-56, *supra*, Speaker's Programs were "definitely places where off label uses might be discussed physician to physician." At the speaker's dinners, Gilead sales representatives were not supposed to be in the room during the dinner, so that it would not seem like a blatant sales pitch. However, they often did remain in the room.

139.   Physicians trained to speak by Gilead knew they could not bring up off label uses but could only discuss them if an audience member brought up the topic. Although speakers refrained from initiating discussion of off-label uses, typically an audience member would ask about off label uses and then the speaker could answer. This witness indicated that questions concerning off-label usage may have been intentionally asked by audience members so that the speaker was free to mention off-label uses, as "the audience was savvy, so they knew they had to bring it up."

### 4.   Further Information Provided By a Former Manager in Sales Training

140.   This former sales training manager, who was identified in Par. 57-60, *supra*, stated that    was knowledgeable about Gilead's practice of off-label marketing because    was directly exposed to it. "There were no smoke and mirrors. It happened."

141.   Specifically, Gilead created training slides that were supposed to outline only FDA-approved uses for their drugs. However, this witness provided a copy of a slide provided to sales representatives and trainers that went into detail to show alternative uses for the drug Viread that were not approved by the FDA. This slide shows that Gilead was knowingly promoting off-

–45–

label marketing to physicians. The slide was shown at least two national sales meetings during in the year prior to this witness's departure. In attendance at those meetings were Martin, Meyers, Gilead's trained Medical Liaisons, and "many additional senior managers." The witness suspected that a comprehensive review of slide presentations created at Gilead for use in Speaker's Programs would reveal additional evidence of a strategy of intentional off-label marketing.

142. There were "subtle" ways in which a physician might learn about off-label benefits. A sales representative could not "come right out and talk about it the doc's office" but they could "hint and circle around the subject." This witness reported that a "tipped off" physician could then contact Gilead's Medical Affairs office, which would provide off label information to the physician, especially if he or she was a "key opinion leader" in the field of HIV. The witness indicated that Medical Affairs would know it was sending out off-label information.

143. The witness indicated that the off-label marketing was still occurring as of the time left the company in 2005.

## DAMAGES CAUSED BY GILEAD'S MISCONDUCT

### A.     The Profit Motive For Gilead's Misconduct: Higher Sales Of Gilead's Drugs

144. Gilead and its senior management either specifically directed Gilead's sales force and other personnel to engage in the improper and illegal promotional and marketing activities identified above (including the improper payments to physicians and the improper off-label marketing) or, at the very least, knew of the improper and illegal promotional and marketing activities but, with a "wink and a nod," allowed them to take place and ratified them.

–46–

145.    According to              put tremendous pressure on its sales team to "make the numbers."  One of the ways in which Gilead "made the numbers" was through its illegal and repeatedly false and misleading promotional activities as detailed above.

146.    As a result of the activities identified above, including improper payments to physicians and the consistent promotion of Viread and other drugs by way of off-label information, Gilead caused the artificial increases in its sales of Viread during the second quarter of 2003, and resulting increased payments for the drug through government sponsored insurers.

147.              accounts of the numerous meetings and presentations      attended, including national and regional meetings, have been corroborated by other former employees and Plaintiff is informed and believes would further be corroborated by current employees, as well.  At both regional and national meetings,          and other sales team members were encouraged to aggressively sell Viread with off-label information.  Moreover, physicians were plied with honoraria, speaking fees, training junkets, advisory counsel fees, and other payments on a consistent and nationwide basis at Gilead.  The account by          and the other witnesses described above of the national scope of these sales and marketing strategies and practices demonstrate that they were company-wide, were not aberrational, and resulted from deliberate business policies and/or practices of Gilead.

**B.    The Massive Damage To The Federal Treasury Due To Gilead's Misconduct**

148.    According to Gilead's 2003 Form 10-K filed with the Securities and Exchange Commission, Gilead's sales of Viread from October 2001 (when sales of Viread began) through December 31, 2003 totaled $807,879,000.  For 2001, sales were $15,586,000.  For 2002, sales were $225,815,000.  For 2003, sales were $566,478,000.

–47–

149.     Based on     experiences,     reasonably estimates that between two-thirds (2/3) and three-quarters (3/4) of sales of Viread were obtained by improper sales and marketing practices, in violation of FDA regulations and other applicable rules, policies, and guidelines. Thus, Plaintiff believes that had Gilead not engaged in the misconduct alleged as to the sales and marketing of Viread, sales of Viread would have been between only $201 million and $266 million during 2001 through 2003, rather than $807 million. Thus, Plaintiff estimates that sales of Viread that were due to Gilead's misconduct totaled between $541 million and $606 million. Because the United States Government generally pays at least 80% of the costs of HIV drugs, Plaintiff believes that the United States Government was overcharged by between $432 million and $484 million due to Gilead's improper activities.

## COUNT I
### United States False Claims Act - Use of False Statements
### 31 U.S.C. § 3729(a)(2)
### (Fraudulent Sales Practices)

150.     Plaintiff realleges paragraphs 1 through 149 of this Complaint.

151.     Over at least the last ten years, Defendant knowingly made or used, or caused to be made or used, false statements including, but not limited to false certifications and false representations relating to sales and marketing practices, in order to cause false or fraudulent claims to be paid by the United States, in violation of 31 U.S.C. 3729(a)(2).

152.     The United States, unaware of the foregoing circumstances and conduct of Defendant, paid inflated claims to Defendant. By reason of these payments, the United States has been damaged in an undetermined amount.

## COUNT II
**False Claims Act - Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)**
**(Fraudulent Sales Practices)**

153.   Plaintiff realleges paragraphs 1 through 149 of this Complaint.

154.   Defendant knowingly presented or caused to be presented false or fraudulent claims including, but not limited to, invoices or demands for payment which were inflated and fraudulent by reason of the false statements described in this Complaint, in violation of 31 U.S.C. § 3729(a)(1).

155.   The United States, unaware of the circumstances and conduct of Defendant, paid inflated claims to Defendant. By reason of these payments, the United States has been damaged in an undetermined amount.

## COUNT III
**Payment Under Mistake Of Fact**
**(Fraudulent Sales Practices)**

156.   Plaintiff realleges paragraphs 1 through 149 of this Complaint.

157.   The United States awarded the contracts to Defendant and made inflated payments on claims arising from the contracts in reliance on Defendant's misrepresentations regarding its sales practices, and was unaware of the fraudulent conduct described above.

158.   Gilead's misrepresentations were material to the payments made by the United States under those contracts.

159.   By reason of the foregoing, the United States has been damaged in an undetermined amount.

**COUNT IV**
**Unjust Enrichment**
**(Fraudulent Sales Practices)**

160.    Plaintiff realleges paragraphs 1 through 149 of this Complaint.

161.    By reason of the United States' payments under the contracts, Gilead received money to which it was not entitled and has thereby been unjustly enriched in an undetermined amount.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    That defendant be ordered to cease and desist from submitting false claims to the United States;

B.    That judgment be entered in favor of the United States and against Defendant in the amount of each and every false or fraudulent claim multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.    That Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.     That judgment be granted for Plaintiff and against Defendant for any costs, including, but not limited to, court costs, expert fees, investigative expenses and all attorneys' fees incurred by Plaintiff in the prosecution of this suit; and

E.     That the United States and Plaintiff be granted such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

DATED: February 26, 2007                     LAW OFFICES OF THOMAS D.
                                             MAURIELLO

                                             THOMAS D. MAURIELLO

                                             501 N. El Camino Real, Suite 220
                                             San Clemente, California 92672
                                             Telephone: (949) 366-4135
                                             Facsimile: (949) 606-9690

                                             Scott R. Shepherd
                                             SHEPHERD, FINKELMAN, MILLER
                                             & SHAH, LLC
                                             35 East State Street
                                             Media, PA 19063
                                             Telephone: 610/891-9880
                                             Facsimile: 610/891-9883

                                             James E. Miller
                                             SHEPHERD, FINKELMAN, MILLER
                                             & SHAH, LLC
                                             65 Main Street
                                             Chester, CT 06412
                                             Telephone: 860/526-1100
                                             Facsimile: 860/526-1120

                                             ATTORNEYS FOR PLAINTIFF AND
                                             RELATOR

# EXHIBIT A

# REDACTED

# **<u>EXHIBIT B</u>**

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**   Public Health Service

Food and Drug Administration
Rockville, MD 20857

TRANSMITTED BY FACSIMILE

Rebecca Coleman, Pharm.D.
Director, Regulatory Affairs
Gilead Sciences, Inc.
333 Lakeside Drive
Foster City, CA 94404

RE:   NDA 21-356
      **Viread (tenofovir disoproxil fumarate) Tablets**
      MACMIS ID # 10666

Dear Dr. Coleman:

This letter notifies Gilead Sciences (Gilead) that the Division of Drug Marketing, Advertising, and Communications (DDMAC) has identified promotional activities that are in violation of the Federal Food, Drug, and Cosmetic Act (Act) and its implementing regulations.  Specifically, representatives of Gilead made both false and misleading oral statements about Viread at Gilead's promotional exhibit booth at the 41st Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC) held in Chicago, Illinois in December 2001.

**False or Misleading Statements and Minimization of Important Risk Information**

Gilead's representatives engaged in false and misleading promotional activities about a boxed warning in Viread's approved product labeling (PI).  The boxed warning states that "Lactic acidosis and severe hepatomegaly with steatosis, including fatal cases, have been reported with the use of nucleoside analogs alone or in combination with other antiretrovirals."

One Gilead representative failed to provide any risk information and instead made the following false or misleading statements about Viread to DDMAC reviewers at Gilead's promotional exhibit booth at ICAAC:

- "no toxicities"
- "extremely safe"
- "extremely well-tolerated"

Two additional Gilead representatives made the following statements:

- The boxed warning is a "product class warning, and there are no problems but it was put into the PI as a 'wait and see' warning."
- Viread "does not affect mitochondria; therefore, you would not expect to see lactic acidosis."
- The warning "is a class effect" and "our PI is the only one that does not name the drug because Viread is a nucleotide, not a nucleoside."

These statements are in violation of the Act because they minimize the boxed warning for Viread and misleadingly suggest that the drug is safer than has been demonstrated by substantial evidence.  In fact, there have been case reports of lactic acidosis in patients receiving Viread in clinical trials and the expanded access program.  Additionally, although in vitro studies may suggest a lack of mitochondrial toxicity, it is misleading to suggest that these conclusions from nonclinical studies have clinical significance when such has not been demonstrated by substantial evidence.  Furthermore, Viread functions as a nucleoside analogue and, therefore, carries the same class warnings as other nucleoside reverse transcriptase inhibitors (NRTIs).

Furthermore, these statements are inconsistent with other risk information in the PI.  Viread's PI contains a warning not to administer the drug to patients with renal insufficiency, and various precautions, such as potential drug interactions when Viread is concomitantly administered with didanosine or with drugs that reduce renal function or compete for active tubular secretion.  The PI also states that treatment-related adverse events that occurred in patients receiving Viread include mild to moderate gastrointestinal events, such as nausea, diarrhea, vomiting, and flatulence.

## Overstatement of Efficacy

A fourth Gilead representative also engaged in false or misleading promotional activities about the efficacy of Viread.  Specifically, this representative stated that Viread "is approved for a broad indication" and characterized it as a "miracle drug."  In fact, Viread was approved by the Food and Drug Administration under accelerated approval status, and the clinical benefit of Viread in HIV patients has not yet been determined.  Moreover, there are substantial limitations to Viread's indication as stated in the PI:

> "VIREAD is indicated in combination with other antiretroviral agents for the treatment of HIV-1 infection.  This indication is based on analyses of plasma HIV-1 RNA levels and CD4 cell counts in a controlled study of VIREAD of 24 weeks duration and in a controlled, dose ranging study of VIREAD of 48 weeks duration.  Both studies were conducted in treatment experienced adults with evidence of HIV-1 viral replication despite ongoing antiretroviral therapy.  Studies in antiretroviral naïve patients are ongoing; consequently the risk-benefit ratio for this population has yet to be determined.

> Additional important information regarding the use of VIREAD for the treatment of HIV-1 infection:

Dr. Rebecca Coleman
Gilead Sciences
NDA 21-356
MACMIS #10666

Page 3

- There are no study results demonstrating the effect of VIREAD on clinical progression of HIV.
- The use of VIREAD should be considered for treating adult patients with HIV strains that are expected to be susceptible to tenofovir as assessed by laboratory testing or treatment history."

The above oral statements made by the Gilead representative are misleading, and therefore in violation of the Act because they overstate the efficacy of Viread, and fail to communicate material facts with respect to the limitations of its indication.

## Requested Actions

Gilead should immediately cease making such violative statements and should cease the distribution or use of any promotional materials for Viread that contain the same or similar violative statements. Gilead should submit a written response to DDMAC on or before March 28, 2002, describing its intent and plans to comply with the above. In its letter to DDMAC, Gilead should include the date on which this and other similarly violative materials were discontinued.

Gilead should direct its response to me by facsimile at (301) 594-6771 or by written communication at the Division of Drug Marketing, Advertising, and Communications, HFD-42, Room 17B-20, 5600 Fishers Lane, Rockville, MD 20857.   In all future correspondence regarding this matter, please refer to MACMIS ID #10666 in addition to the NDA number. DDMAC reminds Gilead that only written communications are considered official.

Sincerely,

*{See appended electronic signature page}*

Laura L. Pincock, Pharm.D.
LT, USPHS
Regulatory Review Officer
Division of Drug Marketing,
Advertising, and Communications

---

This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.

---

/s/

- - - - - - - - - - - - - - - - - - - - - - - -

Laura Pincock
3/14/02  03:36:28  PM

# EXHIBIT C



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service          9 4/80d

Food and Drug Administration
Rockville, MD 20857

TRANSMITTED VIA FACSIMILE

John C. Martin, Ph.D.
President and Chief Executive Officer
Gilead Sciences, Inc.
333 Lakeside Drive
Foster City, CA 94404

Re:    NDA 21-356
       Viread® (tenofovir disoproxil fumarate) Tablets
       MACMIS # 11723

# WARNING LETTER

Dear Dr. Martin:

This Warning Letter objects to Gilead Sciences, Inc.'s ("Gilead") promotional activities for Viread (tenofovir disoproxil fumarate) Tablets. Through routine monitoring and surveillance, the Food and Drug Administration's ("FDA" or the "Agency") Division of Drug Marketing, Advertising, and Communications ("DDMAC") has concluded that Gilead's promotion of Viread violates the Federal Food, Drug, and Cosmetic Act (the "Act") and its implementing regulations.

Specifically, a representative of Gilead made oral representations at Gilead's promotional exhibit booth during the 15th National HIV/AIDS Update Conference in Miami, Florida, on March 31-April 2, 2003, that minimized important risk information and broadened the indication for Viread. Your failure to disclose the fatal risks of lactic acidosis and severe hepatomegaly with steatosis reported with the use of nucleoside analogues raises significant public health and safety concerns. This conduct is particularly troubling because the more than 1,500 attendees of this conference included social workers, AIDS educators, and patients with HIV/AIDS, and you had previously been warned not to engage in such activities.

## Background

Viread was approved under the Subpart H (accelerated approval) regulations, 21 CFR 314.510, on October 26, 2001, for the following indication:

*Viread is indicated in combination with other antiretroviral agents for the treatment of HIV-1 infection. This indication is based on analyses of plasma HIV-1 RNA levels and CD4 cell counts in a*

John C. Martin
Gilead Sciences, Inc.
NDA 21-356

Page 2

*controlled study of Viread of 24 weeks duration and in a controlled, dose ranging study of Viread of 48
weeks duration. Both studies were conducted in treatment experienced adults with evidence of HIV-1
viral replication despite ongoing antiretroviral therapy. Studies in antiretroviral naive patients are
ongoing; consequently, the risk-benefit ratio for this population has yet to be determined. There are
no study results demonstrating the effect of Viread on clinical progression of HIV. The use of Viread
should be considered for treating adult patients with HIV strains that are expected to be susceptible to
tenofovir as assessed by laboratory testing or treatment history.*

Viread is a nucleotide that shares similar structural and functional properties with nucleoside analogues
approved for the treatment of HIV infection, such as its prodrug status that requires metabolic
activation by cellular enzymes to form the pharmacologically active metabolite, the triphosphate form.
The triphosphate form competes with the physiological substrate dATP for incorporation into nascent
DNA, and causes chain termination due to lack of a sugar moiety. Viread does not require the initial
phosphorylation by the nucleoside kinase of the host cells, a property that distinguishes it from
currently approved nucleoside analogues. However, this property of Viread has not been demonstrated
to FDA to convey a clinical advantage over nucleoside analogues.

Because Viread functions as a nucleoside analogue, the approved product labeling (PI) for Viread
includes a box warning that states, "Lactic acidosis and severe hepatomegaly with steatosis, including
fatal cases, have been reported with the use of nucleoside analogs alone or in combination with other
antiretrovirals." This warning is identical to the labeling warnings for nucleoside analogues. In vitro
studies may suggest a lack of mitochondrial toxicity, but we are not aware of any studies that
demonstrate that these results are predictive of in vivo lack of toxicity. Moreover, lactic acidosis has
been observed in clinical trials and in your expanded access program.

On October 26, 2001, a conference call took place between Dr. Jean-Ah Choi from DDMAC and Dr.
[              ] Dr. Choi provided advisory comments regarding proposed launch
materials for Viread. Gilead noted the following points in its November 7, 2001,
correspondence/written meeting minutes to DDMAC:

- "Dr. Choi advised that referring to Viread as a nucleotide in a way that conveyed that this confers
  an advantage over other drugs was not acceptable. In promotional materials references to the
  mechanistic descriptor "nucleotide analog" will be used without conveying that this is an
  advantage."
- "Comparison statements (safer than other regimens) are not supported by data and would be
  acceptable only if studies have been performed evaluating those questions specifically."
- Dr. Choi advised Gilead to include the "most common and most serious findings" regarding
  safety[1]. The most serious findings are the boxed warnings for lactic acidosis and severe
  hepatomegaly with steatosis."
- Dr. Choi informed Gilead that "all promotional information describing the activity of Viread
  should include the limitations of the data as represented in the indication."

---

[1] Viread's PI contains a warning not to administer the drug to patients with renal insufficiency, and various precautions,
such as potential drug interactions when Viread is concomitantly administered with didanosine or with drugs that reduce
renal function or compete for active tubular secretion. The PI also states that treatment-related adverse events that occurred
in patients receiving Viread include mild to moderate gastrointestinal events, such as nausea, diarrhea, vomiting, and
flatulence.

John C. Martin
Gilead Sciences, Inc.
NDA 21-356

Page 3

On March 14, 2002, DDMAC issued an Untitled Letter to Gilead regarding promotional activities that violate the Act. The letter explained that representatives of Gilead made both false and misleading oral statements about Viread at Gilead's promotional exhibit booth at the 41st Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC) held in Chicago, Illinois on December 2001. Specifically, a Gilead representative failed to provide any risk information and made false or misleading representations by describing Viread as "extremely safe," "no toxicities," and "extremely well-tolerated." Two other Gilead representatives minimized the important risk information for Viread by referring to the boxed warning as a "product class warning" and "class effect." The Gilead representatives described Viread as a "nucleotide, not a nucleoside," thereby suggesting that the same safety issues do not apply. Additionally, the representatives claimed that Viread "does not affect the mitochondria," thereby implying that lactic acidosis would not be expected with Viread. Furthermore, a fourth Gilead representative grossly overstated the efficacy of Viread by characterizing it as a "miracle drug" that "is approved for a broad indication."

On March 21, 2002, Gilead responded to DDMAC's March 14, 2002, Untitled Letter. Your letter states that "Gilead has issued a memorandum to U.S. sales and marketing personnel, medical affairs staff, and all Gilead attendees at ICAAC" regarding the violations outlined in DDMAC's March 14, 2002, letter and "reminding them that such violations are inconsistent with Gilead's promotional policies." Additionally, your letter states that "Gilead takes very seriously the policy that all oral and written product promotion accurately represents the approved indication and labeling, and provides fair balance of risks and benefits of the product," and that the letter "constitutes Gilead's commitment to ensure that future violative statements are not made in the promotion of Viread." Despite your assurance that violative promotional activities would cease, your sales representative continues to violate the Act.

## Promotional Activities by Gilead's Sales Representative

On April 2, 2003, at Gilead's promotional exhibit booth during the 15th National HIV/AIDS Update Conference, your sales representative made oral statements that minimized the risk information and broadened the indication for Viread.

### Minimization of Important Risk Information

Your sales representative greatly minimized the important safety information for Viread. Your representative failed to provide any risk information from Viread's boxed warning concerning reported fatal cases of lactic acidosis and severe hepatomegaly with steatosis linked to the use of nucleoside analogues. Your representative claimed that the boxed warning is a "class effect warning on all nucleoside analogues" and did not apply to Viread. Furthermore, your representative referred to the totality of the adverse reactions associated with Viread as "benign." By failing to include any of the important risk information, Gilead misleadingly suggests that Viread is safer than has been demonstrated by substantial evidence or substantial clinical experience. This omission of the boxed warning together with other important risk information for Viread is particularly concerning given the serious risks associated with the drug.

Your representative also stated that because Viread is a nucleotide, not a nucleoside, it is "more potent," has "fewer side effects," and is "safer." As discussed above, it is misleading to suggest that Viread confers any clinical advantages over nucleoside analogues without supporting data. Moreover, Viread functions as a nucleoside analogue and, therefore, carries the same warnings as nucleoside

analogues. Furthermore, the Agency is not aware of any data from head-to-head clinical trials to substantiate claims of more favorable safety or efficacy with Viread over other drug products.

Broadened Indication

Your representative misleadingly broadened the indication for Viread. Your representative failed to convey that Viread is only approved for use in combination with other antiretroviral agents. It is imperative to emphasize that patients take Viread as part of an antiretroviral combination regimen because monotherapy can lead to rapid development of resistant virus, thereby decreasing the therapeutic effectiveness of the drug and reducing the susceptibility of the HIV virus to the drug. Emergence of drug resistance is a major concern in the treatment of HIV patients.

Your sales representative also stated that Viread "improves lipid parameters." FDA is not aware of substantial evidence or substantial clinical experience that supports the claim that Viread has a positive impact on patients' lipid profiles.

These oral statements by your representative recommending or suggesting use of Viread for a use other than that for which FDA has reviewed safety and effectiveness data create a new "intended use" for which adequate directions must be provided in approved product labeling. 21 U.S.C. 352(f)(1); 21 C.F.R 201.5, 201.100, 201.128. Absent such directions, your product is misbranded. 21 U.S.C. 352(f)(1).

**Conclusions and Requested Actions**

Gilead's sales representatives have repeatedly omitted or minimized material facts regarding the safety profile of Viread, and have broadened Viread's approved indication. Due to the significant public health and safety concerns raised by these repetitive promotional activities, we request that you provide a detailed response to the issues raised in this Warning Letter. This response should contain an action plan that includes:

1)   The date on which Gilead ceased dissemination of the above statements and all promotional materials that contain the same or similar statements.

2)   A plan of action to disseminate accurate and complete information to the audience(s) that received the promotional statements described above.

3)   A written statement of your intent to comply with "1" and "2" above.

4)   A commitment to retrain your sales representatives to ensure that their promotional activities comply with your firm's policies and with applicable requirements of the Act and regulations, and an explanation of why/how you expect this retraining to succeed.

Gilead should submit a written response to DDMAC by August 12, 2003, describing its intent and plans to comply with DDMAC's request. If you have any questions or comments, please contact Debi Tran, Pharm.D. or Lesley Frank, Ph.D., J.D. by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising, and Communications, HFD-42, Rm. 8B-45, 5600 Fishers Lane, Rockville, MD 20857.

John C. Martin
Gilead Sciences, Inc.
NDA 21-356

Page 5

We remind you that only written communications are considered official. In all future correspondence regarding this particular matter please refer to MACMIS ID 11723 in addition to the NDA number.

The violations discussed in this letter do not necessarily constitute an exhaustive list. We are continuing to evaluate other aspects of your promotional campaign for Viread and may determine that additional measures will be necessary to address other conduct.

Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, RPh, MBA
Director
Division of Drug Marketing,
    Advertising, and Communications

----------------------------------------------------------------------
This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.
----------------------------------------------------------------------

/s/
- - - - - - - - - - - - - - - - - - - - - - -
Barbara Chong
7/29/03  03:26:37 PM
Signed for Thomas W. Abrams

# __EXHIBIT D__

Poster Number
**4538**

# Long-term Efficacy and Safety of Tenofovir DF (TDF): A 144 Week Comparison versus Stavudine (d4T) in Antiretroviral-Naive Patients

JE Gallant[1], S Staszewski[2], A Pozniak[3], JMAH Suleiman[4], E DeJesus[5],
B Lu[6], K Yale[6], and A Cheng[6] for the 903 Study Team

[1] Johns Hopkins University School of Medicine, Baltimore, Maryland USA;
[2] University Hospital, JW Goethe-Universität, Frankfurt, Germany; [3] Chelsea and Westminster Hospital, London, UK;
[4] Instituto de Infectologia Emilio Ribas, São Paulo, Brazil; [5] IDC Research Initiative, Altamonte Springs, Florida, USA;
[6] Gilead Sciences, Inc., Foster City, California, USA

XV International AIDS Conference
July 11-16, 2004
Bangkok, Thailand

Gilead Sciences, Inc.
333 Lakeside Drive
Foster City, CA 94404
Tel: (650)574-3000
Fax: (650)578-2224

## Background

- Study 903 is the first three-year randomized, double-blind, active-controlled trial designed to evaluate the efficacy and safety of tenofovir DF (TDF) versus stavudine (d4T) in combination with lamivudine (3TC) and efavirenz (EFV) in antiretroviral naive patients

## Methods

**Main Inclusion/Exclusion Criteria**

- HIV-infected patients naive to antiretroviral treatment, 18-65 years of age, with plasma HIV RNA >5,000 copies/mL (pts/mL)
- No significant laboratory or clinical abnormalities
- No CD4+ cell count criteria

**Figure 1. Study Design/Randomization**



## Conclusions

- Through 144 weeks, high proportions of patients in both arms achieved:
  - HIV RNA < 50 c/mL
  - Significant increases in CD4 cell count
- The tenofovir DF arm showed significantly
  - Fewer toxicities associated with mitochondrial dysfunction
  - Better total fasting lipid profile
  - Lower use of lipid lowering agents
  - Less limb fat and weight gain
- Both arms showed similar renal safety profile
- Small decreases (<3%) in bone mineral density were seen in both arms
  - Incidence of bone fractures was lower in the TDF arm

## Results

**Table 1. Baseline Characteristics**

| | TDF + 3TC + EFV (n = 239) | d4T + 3TC + EFV (n = 221) |
| --- | --- | --- |
| Mean age in yrs (Range) | 36 (18 to 64) | 36 (18 to 64) |
| Female (%) | 26 | 25 |
| **Race (%)** | | |
| Caucasian | 64 | 64 |
| Black | 21 | 19 |
| Hispanic | 7 | 8 |
| Asian | 7 | 6 |
| Other | 1 | 2 |
| Mean HIV RNA (c/mL) | 5.1 log | 5.1 log |

**Figure 4. Mean (95% CI) Change in Fasting LDL and HDL Cholesterol at Week 144**

